## REUBEN BAXTER *et al. versus* SAMUEL RODMAN.

The master and crew of a ship engaged on a whaling voyage, who are to receive, in lieu of wages, a proportion of the net-proceeds of the oil which shall be obtained, are not partners with the owners of the ship, and need not be joined in an action brought by the owners to recover of a third person a part of such oil.

When a witness, being asked whether he is interested in the suit, declares that he has parted with his interest, and without further question is allowed to testify in chief, a new trial will not be granted because the deed of transfer or a release was not exhibited.

By a usage in the whaling business, masters of ships meeting at sea sometimes enter into a contract of *mateship;* so that if the ships cruise together, they divide equally the oil obtained, before they separate; if they cruise separately, they make an equal division upon their first meeting afterwards; if the ships accidentally separate and do not meet again, neither can claim of the other, if one returns home full; but if they do meet abroad, and neither has filled, the settlement and division take place immediately. *Held,* that this was a reasonable usage, and binding on the owners of the ships, where they do not prohibit the masters from making such contracts.

Although it is usual in mateships, for the masters to make the division of the oil when at sea, yet if one of them refuses to deliver what is due from him, an action will be sustained, after the return of the ships, between their respective owners.

ASSUMPSIT to recover the value of thirty barrels of oil, alleged to be due to the plaintiffs by virtue of a contract entered into between one Clark, master of the ship Gideon, of Nantucket, belonging to the plaintiffs, and one Sprague, master of the ship Maria, of New Bedford, belonging to the defendant.

At the trial, before *Parker* C. J., it appeared, that the two vessels, being engaged in the whaling business, in the Pacific ocean, met in August 1823, and the masters entered into a contract, which is termed *mateship.* According to a usage which was proved, the effect of *mating* is, to establish a species of partnership in the business of taking whales and procuring oil ; so that if the vessels cruise together, they divide equally the oil obtained by both, before they separate ; or if they cruise separately, upon their first meeting afterwards they make an equal division, by the delivery of oil from the ship which has taken most to the ship which has taken least. If the vessels are then not full, they proceed again upon their business, either upon a new contract of mateship, or each acting independently. If the vessels, after an agreement to

mate, accidentally separate, and do not meet again until the voyage is finished, neither can claim of the other, if either returns filled with oil. But when they do meet abroad after such mateship, the settlement and division of oil take place immediately, unless one has filled.

Neither of the masters had instructions to enter into such a contract ; but it was proved that a usage to mate vessels is common, and almost universal ; that this usage is well known to merchants and owners of whale-ships in Nantucket and New Bedford, and that some vessels owned by the defendant had mated with others, which fact was known to him ; and that the usage was of so long standing and so general, that the knowledge of all concerned in the whaling business would be presumed.

Upon the meeting of these two vessels after having mated, the defendant's ship had on board more oil than the plaintiffs', and an adjustment was made by the masters, by which it appeared, that according to the contract, 70 or 80 barrels of oil were due from the defendant's ship to the plaintiffs'. This quantity was delivered over, except thirty barrels, which the defendant's captain refused to deliver, on the ground that a whale, which it was supposed would yield about 60 barrels, which had been struck by him and taken to the plaintiffs' ship, had been lost by the carelessness or want of skill of the captain and crew of that ship.

And that was one of the grounds of defence. There was evidence, that according to the custom, when vessels have been mated, if any whales, which have been killed, are lost by accident, the loss is to be borne mutually. The jury were instructed to find for the defendant, unless they were satisfied that the whale was lost solely from accident.

Another point in defence was, that by the usage, these joint enterprises are to be settled when the vessels meet abroad, so that each can afterwards pursue her business, and complete her voyage by herself ; and that it was neither according to the usage, nor conformable to justice, that the owner of a vessel should be required to surrender part of her earnings, after, as it may be, he has settled with the crew, and de livered each man his proportion of the net proceeds of the

voyage, according to the custom of the trade, in lieu of wages.* The jury were instructed, that if the contract was fairly entered into at sea, and broken by the defendant's captain, without any fault on the other side, the right of action then accrued, and the owner would remain liable, notwithstanding the inconveniences he might suffer.

The defendant's ship came home full, so that but for the breach of contract abroad, the plaintiffs would have had no ground of action. Several cases were proved, of bargains having been adjusted by owners after their vessels returned ; but there could not be said to be any custom as to what they should do in case of a disagreement between the captains.

The deposition of Clark was objected to on the ground of interest, the captain and all the crew being interested jointly with the owners in the proceeds of the voyage ; but the objection was overruled, he having sworn that he had parted with all his interest.

The defendant objected to the action, also, on the ground that the captain and crew of the plaintiffs' ship were joint owners of the oil, and ought to have been joined as plaintiffs.

A verdict was returned for the plaintiffs, and the defendant moved for a new trial.

*Prescott*, for the defendant, insisted upon the objections, that the action should have been brought by all concerned in interest, and that Clark's testimony ought not to have been admitted ; but he relied chiefly on the points, that the usage proved was vague and unreasonable, and that it did not extend to this case. One of the ships which were mated, may be larger and stronger and better equipped than the other, and yet, by the custom, the oil obtained is to be divided equally, without any regard to those circumstances, and the master of the best ship, without any instructions from his owners, may continue the partnership as long as he pleases. This is a dangerous power, and much greater than a master of a ship possesses by the common law. Usages are to be construed strictly. The one proved permits the masters to make a settle-

Baxter
*v.*
Rodman.

*March* 24th.

438

---

* See *Barney et al.* v. *Coffin, ante,* 1 15.

ment when at sea, and protects them in so doing against their owners ; but it does not go so far as to render the owners answerable in any case whatever.  Suppose that the indebted ship should come home first, must the owner wait for the arrival of the other before he settles with his captain and crew, or must he guess at the deduction to be made from their shares ?   On this point of usage he cited 1 Bl. Com. 77 ; Bac. Abr. *Customs, C ; Haspurt* v. *Wills,* 1 Ventr. 71 ; *S. C.* 1 Mod. 47 ; *Steel* v. *Houghton,* 1 H. Bl. 51 ; *Todd* v. *Reid,* 4 Barn. & Ald. 210.

*S. Hubbard* and *C. G. Loring,* for the plaintiffs, cited to the point that the captain and seamen of the plaintiffs' ship ought not to have been joined in the action, *Wilkinson* v. *Frasier,* 4 Esp. R. 182 ; *Mair* v. *Glennie,* 4 Maule & Selw. 240 ; *Rice* v. *Austin,* 17 Mass. R. 197 ; *Dry* v. *Boswell,* 1 Campb. 329, and notes ; *Hesketh* v. *Blanchard,* 4 East, 144 ; *Muzzy* v. *Whitney,* 10 Johns. R. 226 ; *Wilson* v. *Mower,* 5 Mass. R. 411 ; *Offly* v. *Ward,* 1 Lev. 235 ; *Pigott* v. *Thompson,* 3 Bos. & Pul. 149, and note ; *Sanford* v. *Sanford,* 2 Day, 559, and note :— and to the point of usage, *Fennings* v. *Ld. Grenville,* 1 Taunt. 241.

PARKER C. J. delivered the opinion of the Court.   The first objection in this case is, that as by virtue of the contract on which the master and crew engage in the voyage, they are to receive their pay out of the proceeds of the oil, they are joint owners and *quasi* partners, and so ought all to have joined in the action.

If this were the law, it would be found to be exceedingly inconvenient, and would, no doubt, entirely break up the peculiar mode of conducting these voyages, which have been found to be so beneficial to those who carry them on, and to the country.   That every seaman should be tenant in common with all the other seamen, the master and the owners of the vessel, in all the oil which may be taken on a whaling voyage, so that no action could be brought respecting it without joining all, and none could be sued without the whole, giving every seaman a right to discontinue the action, or to release the claim, or to receive payment for the whole, would be a state of things not suspected by the wise and enterprising men

who have carried on the whale fishery. But we think it is    Baxter
not the law. The owners of the vessel and projectors of the   Rodman.
voyage are the owners of the product of the voyage. The true
meaning of the shipping contract is, that the men shall be paid
out of the proceeds in a stipulated proportion. It is an agree-
ment as to the mode of compensation, and gives them no
property in the oil, but only regulates the amount of compensa-
tion. This we think is the true construction, and in this we
are supported by the cases cited by the plaintiffs' counsel.[1]

The objection to the competency of the plaintiffs' captain
to testify, is sufficiently answered by his declaration under
oath, in reply to an interrogatory by the defendant, that he
had parted with all his interest and received a compensation
therefor. If the defendant had desired to ascertain whether
this was a binding transfer, he should have pursued his ques-
tions, so as to have brought the form of the transfer before
the Court. It is not unusual for members of corporations to
sell out their interest in order to testify ; and this fact is
thought to be sufficiently proved by their declaration on the
stand ; unless, upon further examination, it should appear that
the transfer was merely pretended, or was not valid.

As to the custom of the trade under which the defendant's
captain made the contract, for the breach of which the action
is brought, it appears to be of long standing, almost universal,
and specially known to the defendant. If it be a lawful cus
tom, he, as owner, is bound, because, with general instruc-
tions, a captain is presumed to have authority to conduct his
voyage in reference to it ; he is certainly at liberty, if he is
not bound, to act in conformity to it, and whatever he does
pursuant to it, is done by him as agent and by authority. It
is then the owner's contract, and he is answerable if it be
broken.

The custom must no doubt be lawful and reasonable ; i.    **440**
is lawful, if reasonable and useful. Perhaps there can be no
better evidence of the reasonableness of a custom, than its
antiquity and uninterrupted prevalence. This is a custom
coeval with the trade in which it is used, and although every

---

[1] See Abbott on Shipping, (4th Amer. ed.) 432, n. (1) ; *Grozier* v. *Atwood*,
4 Pick. 234.

owner of a vessel may, by special instructions, prohibit his captain from conforming to it, no instance was shown at the trial, of any such prohibition.

The custom arose, probably, when the trade was pursued on a small scale, with smaller vessels and less numerous crews than are usual now ; but t seems to have kept its ground, notwithstanding the changes in these particulars.  Every captain going upon such a voyage has a right to presume that his employers will justify, if they do not expect that he will make, contracts of this nature, which time has so long sanctioned.

The custom being then indisputably proved, and it being in no respect unlawful, the contract made under it having been unjustifiably broken by the defendant's agent, he is responsible for the damages, unless the principal ground of defence is maintained, viz. that it is an essential part of the custom, that these bargains should be brought to a close in the seas where they are made, and that if broken there, no remedy exists for the suffering party.   But so unreasonable a custom as this has not been proved ; if it had been proved as a branch of the custom upon which we have been remarking, it might render the whole void for its unreasonableness.

It would amount to this, that a bargain made between two captains for the mutual benefit of all concerned in the two vessels, might be faithfully performed by one, and if grossly violated by the other, he should have no redress, unless he sought it by force in distant seas, where no law or government existed to aid him ; and the consequence might be, that a captain, after having received from his partner a contribution according to the custom, and afterwards becoming indebted, might return home with a portion of oil which ought in justice to have been delivered to his partner.   It is true, that there was no proof of a custom to settle controversies after the vessels returned, but this is because controversies have rarely arisen.   In the only instances in which the bargains made pursuant to the custom appear to have been broken, relief has been sought and obtained at home.

But there is no need of a custom to give a remedy under these circumstances.  If the contract has been lawfully made and improperly broken, the right of action is immediately

vested, and the law gives a remedy without the aid of custom. Without doubt, it may be often inconvenient, and sometimes injurious, to have the settlement of a voyage delayed until both vessels shall have returned, and their joint concerns have been adjusted ; but this should be avoided by prohibiting the master from making such contracts.

Besides, if the master acts faithfully towards his owners, he will inform them under what circumstances he left the seas, and give them opportunity to retain enough of the proceeds to answer the demands which may be made upon them ; if he neglects to do this, he may be answerable to them for any loss they may sustain.

It is said, that as part of the custom proved, is, that if either vessel shall return full, no contribution shall take place, and as the defendant's vessel did return full, the *casus fœderis* has not happened. But it is only when vessels separate accidentally, after making such a bargain, that this qualification applies. It would be absurd to say, that either party might defeat the right of the other by voluntarily refusing to perform the contract and withdrawing, after the right of the other has become fixed.

*Judgment according to the verdict.*